*1003 OPINION OF THE COURT
Joseph A. Zayas, J.
After a jury trial, defendant, Shaun Mullally, was convicted of criminal trespass in the second degree (Penal Law § 140.15) and acquitted of burglary in the second degree (Penal Law § 140.25 [2]) and related charges. Defendant now moves to set aside the guilty verdict pursuant to Criminal Procedure Law § 330.30 (1), arguing that his conviction requires reversal as a matter of law because the trial evidence was legally insufficient to establish second-degree trespass. Specifically, defendant contends that the building that he was convicted of illegally entering does not constitute a “dwelling” as defined by Penal Law § 140.00 (3). The People oppose the motion, contending that the home constitutes a dwelling.
Defendant’s motion requires the court to examine important questions regarding the definition of a dwelling under the trespass and burglary statute where the New York City Department of Buildings issues a vacate order associated with a home damaged in a fire. More specifically, defendant’s motion requires the court to decide whether a fire-damaged home may be deemed to be a dwelling — that is, a “building” “usually occupied by a person lodging therein at night” (Penal Law § 140.00 [3]) — even though the evidence demonstrated that no one actually slept at the home at night during an eight-month period in which a vacate order was in effect. Resolution of this issue is important given the precipitous increase in burglary-related offenses arising from alleged looting of flood-damaged homes in Queens County during the immediate aftermath of Hurricane Sandy (see Joe Kemp, Areas Hit Hard by Hurricane Sandy Suffer Big Rise in Burglaries, Dec. 4, 2012, http:// www.nydailynews.com/new-york/areas-hit-hard-sandy-sufferbig-rise-burglaries-article-1.1213560 [accessed Jan. 7, 2013] [reporting a “1,020% jump from the five burglaries investigated during the same period last year” in the coastal neighborhoods of Rockaway and Breezy Point]). Because this court finds that the fire-damaged building in this case was a dwelling — a “building which is usually occupied by a person lodging therein at night” (Penal Law § 140.00 [3]) — as defined by the statute, defendant’s motion is denied in its entirety.
Criminal Procedure Law § 330.30 (1) allows a court to grant a motion to set aside the verdict based on “[a]ny ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or *1004 modification of the judgment as a matter of law by an appellate court” (see People v Carter, 63 NY2d 530, 536 [1984]). It is well established that a court reviewing a legal sufficiency claim must affirm a defendant’s judgment of conviction if “ ‘any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt’ ” (People v Contes, 60 NY2d 620, 621 [1983], quoting Jackson v Virginia, 443 US 307, 319 [1979]). Moreover, the evidence must be viewed in a light most favorable to the People (People v Ford, 66 NY2d 428, 437 [1985]; People v Arena, 284 AD2d 545 [2d Dept 2001]).
Here, there is no question that defendant asserted a “ground” for dismissal of the trespass charge by moving on “the record” to dismiss that charge after the close of the People’s case and after the close of all the evidence. Nor is there any question that the current motion is identical to the very “ground” defendant raised during the trial. The only remaining question is whether the court properly denied the dismissal motion.[1]
In the instant case, during the jury trial complainants Thomas Donlon and Mario Mitarotunda testified for the People. The evidence, viewed in a light most favorable to the prosecution, demonstrated that in April 2005, a fire emanating from loose wires attached to a Con Edison pole damaged numerous homes on a street in Glendale, Queens, including a two-family house that Thomas Donlon had owned for the past 45 years. The ensuing smoke and water damage prompted the New York City Department of Buildings to issue a temporary vacate order, which, in turn, prompted Mr. Donlon, his son-in-law, Mario Mitarotunda, and other family members to temporarily vacate the structure and find lodging elsewhere.
In June 2005, almost two months after the fire, the house lacked electricity, certain windows had been boarded up, there were holes inside some of the sheetrock, and there was damage to some portions of the exterior of the building and the roof. Mr. Donlon’s basement apartment, however, “didn’t have too much damage” and his property in the basement was “not damaged by the fire.” Although the house had been compromised to some *1005 extent, the complainants undertook efforts to secure it by locking the front door with a key. Indeed, if someone, such as a claim adjuster or city official, wished to enter the house, that individual would have to “make an appointment” with Mr. Mitarotunda so that he could “let them in.” Also locked on the property was a plywood board fence that had been placed across the common driveway that the complainants shared with their neighbor. Much like the house, entry to the driveway through this fence was only possible with the use of a key.
After the fire, Mr. Mitarotunda went to the house “at least three times during the week” and then “always on weekends” because he feared that the property would be burglarized. Mr. Mitarotunda made one such visit to the house on June 12, 2005. Mr. Donlon also visited the property “often” — “almost every day” — to “check on it.” He was there on June 13, 2005. The complainants kept the vast majority of their belongings, including furniture, beds, and other personal items not destroyed by the fire, inside their respective apartments at the premises. The only property that Mr. Donlon removed from his house during the period that the vacate order was in effect was some clothing and his golf clubs. Mr. Mitarotunda also removed a limited number of items from his apartment. Because the complainants had suffered some property loss, both filed insurance claims.
On the morning of June 14, 2005, Mr. Donlon went to his house. After unlocking the front door with his key, Mr. Donlon observed certain damage inside the home, including broken molding around Mr. Mitarotunda’s entrance door and a broken window in the basement. Upon making this observation, Mr. Donlon called his son-in-law, Mr. Mitarotunda, who called the police. The police ultimately recovered a beer bottle and cigarette butt, both of which contained defendant’s DNA, from inside the house. There was also evidence presented during the trial that defendant worked as a laborer in one of the other fire-damaged houses which shared a driveway with the Donlon home at around the time that the beer bottle and cigarette were discovered.
One month after the trespass, Mr. Donlon and Mr. Mitarotunda began to make several improvements to the house, including the installation of a gate on the basement window. By December 24, 2005, Mr. Donlon had moved back into his property.
The defendant argues that the verdict must be set aside because the People failed to establish that the building that de *1006 fendant was convicted of illegally entering was a dwelling as defined by the statute. In opposition, the People argue that the building in question was a “dwelling.”
A person is guilty of criminal trespass in the second degree, as defined in Penal Law § 140.15 (1), “when ... he or she knowingly enters or remains unlawfully in a dwelling.” A dwelling is defined as a “building which is usually occupied by a person lodging therein at night” (Penal Law § 140.00 [3] [emphasis added]).
In People v Quattlebaum (91 NY2d 744, 747-748 [1998]), the Court of Appeals, noting that “[i]n most cases, [the foregoing] determination will be a question of fact for the jury based on the particular situation before it,” adopted a non-exhaustive list of factors for a court to consider when deciding whether a building is a dwelling. Those factors, as originally set forth in the case of People v Sheirod (124 AD2d 14, 17 [4th Dept 1987]), include “(1) whether the nature of the structure was such that it was adapted for occupancy at the time of the wrongful entry; (2) the intent of the owner to return; and, (3) whether, on the date of the entry, a person could have occupied the structure overnight” (People v Quattlebaum, 91 NY2d at 748).
Relying in part on the temporary vacancy doctrine, the Court noted that a dwelling does not lose its designation as such even though the occupant is temporarily absent (id.; People v Henry, 64 AD3d 804, 805 [3d Dept 2009]). In Quattlebaum, the building in question was a school with an office on the fifth floor that contained a bed that was occasionally used for overnight stays. The Court had to decide whether the school, which defendant entered through the first floor offices, was a dwelling. The Court, relying on Sheirod, held that such a building was not a dwelling as defined by the statute because, inter alia, “[n] either the building as a whole nor the fifth floor office had the customary indicia of a residence and its character or attributes” (People v Quattlebaum, 91 NY2d at 748).
In People v Barney (99 NY2d 367 [2003]), the Court of Appeals expanded on the factors that a court can consider when determining whether a building is a dwelling within the statutory definition. In that case, the Court ruled that “[i]mmediate past use of the building and its lack of abandonment” were additional factors for a court to consider (id. at 372). The Court also explained that each factor does not have to be present in every case. In Barney, the building was a fully furnished house that had been occupied by an individual who had recently died. *1007 Relying on Sheirod, the Court held that the house was a dwelling because the residence was “suitable for human habitation,” and had been occupied by the decedent only three days before the burglary (id. at 373).
Here, when viewing the evidence in a light most favorable to the People, the jury, as factfinder, had a rational basis to conclude that the complainants’ house was a dwelling as defined by the statute. The structure, a two-family house that Mr. Donlon had owned and resided in for the past 45 years, served as the primary residence for Mr. Donlon, his son-in-law, Mario Mitarotunda, and other members of Mr. Donlon’s family. Although the house was unoccupied on the date of the trespass and the complainants temporarily did not sleep there because of the vacate order that had been issued by the City of New York in response to a fire that had damaged parts of the structure, the house still embodied certain characteristics that were consistent with residential occupancy. The complainants testified, for example, that all of their furniture, including their beds, and the vast majority of their personal belongings were kept inside the house. According to Mr. Donlon the only items that he removed from the premises during the period that the vacate order was in effect were his clothing and his golf clubs. Indeed, Mr. Donlon specifically testified that his basement apartment “didn’t have too much damage” and that his personal property in the basement was “not damaged by the fire.” When Mr. Mitarotunda was asked what property of his remained inside the house, he stated, “basically my apartment everything was there.”
Moreover, the complainants took great pains to protect the house and the personal belongings inside by keeping the front door locked. They also monitored the property nearly every day to ensure the integrity of the structure. Given the foregoing circumstances, the court finds that the house contained “the customary indicia of a residence” and that the “nature of the structure was such that it was adapted for occupancy at the time of the wrongful entry” (People v Quattlebaum, 91 NY2d at 748), notwithstanding the fact that the structure was damaged and the fact that the complainants were temporarily not sleeping there.
Furthermore, there was ample evidence for the jury to find that the complainants, though temporarily absent from the house, possessed the “intent ... to return” (id.) to the building. The complainants testified that they only removed that *1008 property which was necessary for them to live outside the house for a temporary period of time. Moreover, the efforts that the complainants undertook to protect the house — locking the front door, surveilling the property — was conduct that was consistent with occupants who cared for the house and who intended to return to it once it was restored. The jury also heard testimony from Mr. Donlon that he moved back into the house as soon as construction on it was completed. Applying the Quattlebaum/ Barney factors here, there is no doubt that there was sufficient evidence of an intent “to return” to the premises (id.) and a complete “lack of abandonment” of the damaged premises (People v Barney, 99 NY2d at 372).
For all of these reasons, this court concludes that the Donlon house was a dwelling — it was “usually occupied by a person lodging therein at night” (Penal Law § 140.00 [3]), even though no one actually slept at the home during the eight-month period that the vacate order was in effect.
The foregoing ruling is consistent with the First Department’s decision in People v Abarrategui (306 AD2d 20, 21 [1st Dept 2003]), the case whose facts are most analogous to the facts here. The building at issue in Abarrategui was the Millennium Hotel, a structure that had been severely damaged on September 11, 2001. Because the damage was significant, certain “temporary restrictions” had been placed on the hotel, which were in effect on September 13, 2001, the date the defendant was found to be in possession of credit cards that a guest of the Millennium Hotel had left in his room after fleeing from the hotel on September 11, 2001 (id.). The Court held that the hotel was a dwelling under the pertinent statute because management had made efforts to repair that property so that it could be reopened for business and there was no evidence that the hotel had been abandoned. Further, the Court, in dicta, drew an analogy between the “hotel’s situation” and “a house rendered temporarily unsuitable for habitation as the result of a fire” (id.). According to the Court, a fire-damaged house “would not cease to be a ‘dwelling’ ” merely because the occupants were temporarily unable to reside inside the compromised property (id.).
Nonetheless, defendant argues that the building was not a dwelling because a person could not have occupied the structure overnight on the date of the trespass. This court does not find that fact dispositive because “[i]t is not necessary that each [iQuattlebaum] factor be present in every case” (People v Barney, 99 NY2d at 372).
*1009 Furthermore, it is inaccurate to state, as defendant does, that the complainants “could not lodge in the building ... on the date of the offense as a matter of law due to the City’s Vacate Order.”[2] Although the court does not condone the intentional disregard of the City’s vacate order, the fact remains that the Donlons and the Mitarotundas could have decided to ignore the City’s vacate order (as well as any accompanying structural danger posed by the fire damage) and sleep on their beds at the premises at any time. Indeed, we know from experience that homeowners and others facing an impending calamity, such as the recent Superstorm Sandy which wrought unprecedented damage to homes in Queens County, routinely disregard evacuation and vacate orders issued by the City (see Tom Hays & Colleen Long, Hurricane Sandy: Nor’easter Looms over New York as Region Recovers from Storm, Nov. 6, 2012, http:// www.huffingtonpost.eom/2012/ll/06/hurricane-sandy-noreasternew-york-jersey-storm_n_2081726.html [accessed Jan. 7, 2013]). Homeowners willingly decide to do this with full knowledge that they may suffer not only the consequences of the impending calamity but also the legal consequences of violating the City’s order because they want to protect their homes from the very evil that happened in this case — the prospect of opportunistic criminals who may decide to loot a home that has already suffered great damage or loss. In this respect, it cannot be fairly said that a home subject to a temporary vacate order is not “usually occupied by a person lodging therein at night” (Penal Law § 140.00 [3]).
Equally unavailing is the argument that the house was not a dwelling because there were no occupants in the building who could be subject to “midnight terror” (see Quinn v People, 71 NY 561 [1878]). This argument incorrectly suggests that there is a physical presence requirement under the statute, which, of course, there is not. The statute merely requires that the dwelling is “usually occupied” by a person lodging inside the structure at night. And in this case, the jury heard evidence to that effect. Indeed, the testimony adduced at trial established that Mr. Donlon’s absence from the house was temporary, that he visited the structure regularly to check on it, and that he *1010 moved back into the building as soon as the damage was repaired and the vacate order was lifted.
Furthermore, People v Lowe (284 AD2d 413 [2d Dept 2001]), the case upon which defendant heavily relies, is factually distinguishable. In Lowe, defendant was convicted of second-degree burglary. At trial, the complainant testified that although he owned the building that the defendant illegally entered, and had made a limited number of renovations to the structure, he never resided in the property himself, and never intended to reside in the property. The Second Department, relying on the Sheirod factors, held that the building, still under renovation, was not a dwelling. In rendering this decision, the Court relied on the facts that the building was entirely unfurnished, that no one regarded the building as his or her place of residence, and that it was not readily habitable. Here, by contrast, the jury heard testimony from the complainants that the house, despite having been compromised by a fire, was filled with furniture and other personal effects. Indeed, Mr. Donlon’s basement apartment was habitable since it did not “have too much damage” and his property in the basement, including his bed, was “not damaged by the fire.” There was also ample evidence for the jury to conclude that the complainants, vigilant in the protection of their home, treated the structure as their permanent place of residence.
Finally, this court expressly declines to adopt a rule which would effectively permit a home to forfeit its designation as a dwelling the moment the City issues a vacate order after the structure has been compromised by a catastrophic event such as a fire, flood, or other natural disaster (cf. People v Barney, 99 NY2d at 373). Without good reason, such a rule would limit criminal liability for burglars who target compromised houses during periods of instability. Yet burglary and trespass crimes should not be statutorily mitigated (see n 1, supra) simply because the City has exercised caution to protect its citizens by gluing a vacate order to the front door of damaged premises after some calamity. Indeed, given the vulnerability of these homes to opportunistic looters, such homes should receive more protection under the law, not less.
For these reasons, and those stated above, the court finds that the evidence was legally sufficient to establish that the complainants’ house was a dwelling as defined by the statute. Accordingly, defendant’s motion is denied.

. Although defendant moves to “dismiss” the second-degree trespass count, the appropriate remedy, were the court to find insufficient evidence that the home was a dwelling, would be to reduce that count to the lesser included offense of trespass (Penal Law § 140.05), which does not contain a “dwelling” element (see CPL 330.50 [1]; 470.15 [2] [a]; People v Murray, 278 AD2d 898 [4th Dept 2000] [where Court finds dwelling evidence insufficient, Court reduces second-degree burglary conviction to third-degree burglary, a lesser included offense]).

. There was no evidence adduced at trial regarding the nature of the vacate order. The court, however, notes that the Commissioner for the New York City Buildings Department has the authority to issue a vacate order when the conditions of a building are “imminently perilous, dangerous or detrimental to life, public safety or property” (Administrative Code of City of NY §§ 28-207.4; see also 28-207.4.1).